**DAVIS et al. v. TEXAS CO. et al.**
**(No. 8008.)**

(Court of Civil Appeals of Texas. Galveston. March 25, 1921. Dissenting Opinion April 6, 1921. Rehearing Denied June 16, 1921.)

1. **Mines and minerals** ⟨⟩55(7)—**Release of rights under oil grant by owner of undivided interest does not affect other interest.**

An instrument declaring null and void a so-called oil lease conveying oil, gas, coal, and other minerals, and purporting to discharge and release the land thereby covered from its provisions, executed by the owner of an undivided two-thirds interest in the so-called oil lease, could not affect the other one-third interest.

2. **Corporations** ⟨⟩617(2)—**President of corporation not paying franchise tax could not execute release of land covered by oil grant.**

Under Sayles' Ann. Civ. St. Supp. 1906, arts. 5243i, 5243j, forbidding the transaction of any business by corporations failing to pay their franchise tax, a release of land covered by an oil grant by the president of a corporation who had forfeited its right to do business by failure to pay its franchise tax was futile, as the making of the release was an act of business, and he could not do for the corporation what it was without legal capacity to do for itself.

3. **Corporations** ⟨⟩617(2) — **President held without authority to execute release of corporation's rights under oil grant.**

A president of a private corporation, years after it had forfeited its right to do business, was without authority to execute a release of land covered by an oil grant owned by the corporation without any consideration to the corporation and without the knowledge or participation of any other stockholder or director or any action by the corporation's governing body.

---

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Corporations ⬉429—Persons claiming under release of rights under oil grant by president held bound to inquire into his authority.**

Though an instrument executed by the president of a private corporation years after it had forfeited its right to do business declaring a so-called oil lease owned by the corporation null and void and releasing the land covered thereby bore the corporation's seal and recited that the corporation was acting through the president, it amounted to such an assumption by him of unusual, exceptional, and extraordinary power outside the ordinary course of affairs and beyond his apparent or ex officio authority as to devolve on those claiming under the release the duty of inquiring as to the existence of the power and the facts bringing it into being, and they could not claim to be innocent purchasers.

**5. Mines and minerals ⬉55(3) — Oil grant held to convey title to oil and minerals, and not mere leasehold right.**

An instrument which, for a nominal consideration (presumably paid), "granted, bargained, sold, and conveyed * * * all the oil, gas, and coal and other minerals" in a described tract of land with usual surface privileges, to have and to hold to the grantee, his heirs and assigns, on condition that it should be void if drilling was not commenced and prosecuted with due diligence within two years, but providing that such forfeiture might be prevented by the payment of $10 a year, and that the completion of a well should operate as a full liquidation of all rental for the remainder of the term, and that, if oil or other minerals should be discovered, the grant should be in force for 25 years from the time of the discovery and as much longer as oil or other minerals could be produced in paying quantities, and that the grant was not intended as a mere franchise, but as a conveyance of the property for the purpose mentioned, when followed by a substantial performance of the drilling terms with the knowledge and approval of the grantors at a considerable expenditure of money, vested in the grantee and his assigns the legal title to nine-tenths of the minerals subject to the reserved royalty for the specified period, and not a mere leasehold right or option to prospect.

**6. Deeds ⬉95—Apt words of conveyance not disregarded in determining character of instrument in absence of contrary intention in context.**

While mere words of conveyance alone, though apt and usual, will not fix the character of the estate passed by an instrument, if from the context as a whole the plain intention was otherwise, in the absence of any such contextual indications the chosen words will neither be disregarded nor given other than their usual meaning in the trade, business, or transaction to which they relate.

**7. Mines and minerals ⬉49 — Rights under grant not barred by adverse possession of surface.**

The rights under an oil and mineral grant passing the legal title were not barred by limitations where there was no adverse possession, cultivation, use, or enjoyment of the subsurface land for the required length of time, but only possession of the surface for farming and grazing purposes, as possession of the outer surface is not that of the minerals beneath.

**8. Mines and minerals ⬉55(2)—Provision of oil grant that completion of well should operate as liquidation of rental held condition subsequent.**

Where an oil and mineral grant, which passed the legal title to the minerals subject to a reserved royalty, provided that it should be void if drilling should not be commenced and prosecuted with due diligence within two years, but that a forfeiture might be prevented by the payment of $10 a year until a well was commenced, a further provision that the completion of a well should operate as a full liquidation of all rental under this provision during the remainder of the term was a condition subsequent.

**9. Mines and minerals ⬉55(2) — Oil grant held so explicit as to preclude implied conditions.**

An instrument which granted, bargained, sold, and conveyed all the oil and other minerals in a described tract of land, reserving a percentage of the oil as royalty, and provided that the grant should be void unless drilling should be commenced and prosecuted with due diligence within two years, but that a forfeiture might be prevented by the payment of $10 a year until the well was commenced, and that the completion of a well should operate as a full liquidation of all rental under this provision during the remainder of the term, held so explicit as to preclude the arising of any other conditions by implication except, perhaps, an obligation to protect the land from drainage and further reasonably develop it after it had been proven to be oil-bearing territory, under the rule that additional terms may be read into written contracts only when they are silent about, and not inconsistent with, what is sought to be so interpolated.

**10. Mines and minerals ⬉49—Failure to comply with implied obligation of continued drilling does not defeat rights where land in another's adverse possession.**

Assuming that under an oil grant which passed the legal title to the oil and other minerals and provided that the completion of a well should operate as a full liquidation of all rental for the remainder of the term, and that on discovery of oil or other minerals the grant should be in full force for 25 years and as much longer as oil or other minerals could be produced in paying quantities, the grantees had the duty of reasonable protective and continued development should the land be shown to be oil land, the failure to comply with such implied condition did not defeat the rights under the grant where at the time the contingency actually arose by the discovery of oil upon a contiguous tract those claiming under subsequent conveyances from the grantors were in the possession of the land and drilling thereon to the exclusion of those claiming under the oil grant.

⬉For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**11. Mines and minerals ⬤⟿55(8)—Obligation of continued drilling held merely covenant, breach of which did not forfeit grant, but merely gave grantors right to sue for damages, etc.**

Assuming that it was an implied condition of an oil and mineral grant which provided that the completion of a well should operate as a liquidation of all rental for the balance of the term that the grantee should continue drilling or meet contiguous development, the obligation amounted only to a covenant on the part of the grantee, the violation of which would not constitute a forfeiture ipso facto, but merely give the grantors the right in a proper action after due notice, demand, etc., to recover damages for the breach or obtain a decree of rescission and cancellation of the contract.

**12. Mines and minerals ⬤⟿55(8)—Facts held not to authorize action for violation of implied covenant to continue drilling.**

Assuming that under an oil grant providing that the completion of a well should operate as a full liquidation of all rental during the remainder of the term it was an implied covenant that the grantee should continue drilling to meet the development of contiguous lands, the facts *held* not to authorize an action for violation of the covenant.

**13. Mines and minerals ⬤⟿55(7)—Where grant passed legal title, rights not lost by abandonment.**

Abandonment, in the absence of some act or deed legally sufficient to divest the title, is inapplicable to a legal title to land, and hence could not defeat the legal title under an oil and mineral grant which conveyed title to the oil and minerals, and not a mere leasehold.

**14. Mines and minerals ⬤⟿55(8)—Abandonment of rights- under grant was for jury where there was strong evidence of nonabandonment.**

If the estate created by an oil grant was of such a nature as might be forfeited by abandonment, the question whether an abandonment had occurred was one for the jury, where there was strong evidence to the contrary.

**15. Estoppel ⬤⟿95—Rights under oil grant held not lost by estoppel by silence.**

Estoppel was not available against the title to oil and minerals under a grant passing the legal title under which drilling had been stopped, where nothing was said or done by plaintiffs, the present owner of the grant, or any predecessor in title, amounting to a disclaimer or denial of the title, and nothing said or done was intended or would reasonably have been expected to have been acted upon by defendants or any predecessor in title in buying or developing the land; and defendants and those in privity with them knew of plaintiffs' title and made no inquiry in regard thereto, and in buying or developing the land did not rely on anything said or done by plaintiffs or any predecessor in title on which they had a right to rely, but on their own independent judgment; and where, in the development, more than enough money had been received to fully reimburse all outlay, since, as respects land, the plea can-

not be based upon mere silence or inaction, nonclaim or neglect, or want of use or possession, but only on affirmative words or acts, amounting to actual or constructive fraud.

Sonfield, Sp. C. J., dissenting.

Appeal from District Court, Brazoria County; R. L. Cole, Special Judge.

Suit in trespass to try title by Nelson Davis and others against the Texas Company and others. Judgment on a directed verdict for defendants, and plaintiffs appeal. Reversed and remanded, with instructions.

Presley K. Ewing, W. J. Howard, and Ewing Werlein, all of Houston, and A. R. Rucks, of Angleton, for appellants.

Baker, Botts, Parker & Garwood, of Houston, Louis J. Wilson, of Angleton, Ballinger Mills, of Galveston, C. K. Lee, of Fort Worth, and C. C. Wren, of Houston, for appellees.

GRAVES, J. On February 23, 1901, W. F. Arnold and Kate Arnold, his wife, were occupying as part of their homestead 81½ acres of land in the northeast part of the J. H. Bell league in Brazoria county, Tex. On that date they executed and delivered to John C. Underwood the following contract or conveyance affecting the 81½ acres:

"The State of Texas, County of Brazoria.

"Know all men by these presents: That I, W. F. Arnold, of Brazoria county, Texas, the party of the first part, in consideration of the sum of $1.00 paid by John C. Underwood, party of the second part, the receipt of which is hereby acknowledged, and the further consideration hereinafter mentioned, have granted, bargained, sold and conveyed, and do by these presents grant, bargain, sell and convey, unto the said party of the second part, heirs and assigns, all of the oil, gas, and coal, and other minerals in and under the following described land, together with the right of ingress and egress at all times for the purpose of drilling, mining, and operating for minerals, and to conduct all operations and lay all pipe necessary for the production, mining, and transportation of the oil, gas, water, coal, or other minerals, with the right to use sufficient water, gas, or oil to operate said property, and shall have the right to remove all machinery, fixtures, and improvements placed thereon at any time, reserving, however, to the party of the first part the equal one-tenth of all oil produced and saved upon said premises, to be delivered in the pipe line to the credit of the party of the first part free of charge. If coal is found, the parties of the second part agree to pay the first party four cents per ton for every ton of the same that is mined and marketed, payable quarterly; if gas or other minerals are found, second parties agree to pay the first party one-tenth for the product each year, payable quarterly for the product of each well, while the same is being used off the premises; and the party of the first part by furnishing his own pipe and connections shall have sufficient gas free of cost for use in one dwelling house on

the premises, so long as gas is utilized off the premises, but at his own risk. Whenever first party shall request it, second party shall bury all oil and gas lines and pay all damage done to the growing crops by reason of burying and removing the same. No well shall be drilled within 200 feet from any building now on said premises without the consent of the first party. Said land being of the following description, to wit: In the league of land originally granted to Josiah H. Bell in said Brazoria county, Tex., fully described in deed of John Q. Jackson to me, which said deed is recorded in Book M, pages 142 and 143 of the deed records of Brazoria county, Tex., reference to which is hereby made for a full description of said land, containing eighty-one and one-half acres, more or less.

"To have and to hold the above-described premises, unto the said parties of the second part, their heirs and assigns, upon the following conditions: In case operations for either the drilling of a well for oil, gas, or other minerals is not commenced and prosecuted with due diligence within two years from this date, then this grant shall immediately become null and void as to both parties; provided that said second party may prevent such forfeiture from year to year by paying to the first party the sum of $10.00 per year until such well is commenced or until shipments from such mine have begun, and it is agreed that the completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term of this lease, which payments can be made at the Bank of ——— or payable direct to the party of the first part.

"In case the parties of the second part should bore and discover either oil or other minerals, then in that event this grant, incumbrance, or conveyance shall be in full force and effect for twenty-five years from the time of the discovery of said product, and as much longer as oil, water, gas, or other minerals can be produced in paying quantities thereon. Whenever sales are being made of the product produced on the land above described, a settlement thereof shall be made at the end of each quarter. This grant is not intended as a mere franchise, but is intended as a conveyance of the property above described for the purpose herein mentioned, and it is so understood by both parties to this agreement. It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors, administrators and assigns. It is agreed and understood that there shall be no interference with my farming operations unless full remuneration shall be paid to me for such interference.

"Witness our hands this twenty-third day of February, 1901

"[Signed]          W. F. Arnold.
                   "Kate Arnold.
                   "Jno. C. Underwood."

Subsequently, on November 1, 1901, one of Underwood's assignees reconveyed or released to the Arnolds 5 acres out of the 81½-acre tract, leaving 76½ acres as the net effect of their conveyance to Underwood.

By later transfers, assignments, and other means not material here, whatever rights and interests in this net 76½ acres that passed to Underwood under the instrument between him and the Arnolds vested in the appellants in this case, and all their claims in this suit are referable to and based upon it.

Afterwards Arnold and wife, ignoring this pre-existing contract or conveyance they had made to Underwood, which had been shortly after its date duly recorded, by deeds dated, respectively, November 21, 1906, December 11, 1908, December 26, 1908, and August 25, 1917, each of which acknowledged the receipt of a good and valuable consideration, and had been shortly after its date duly recorded, conveyed in different parcels the whole of the fee in the entire 81½ acres to certain persons, all of whose interests thereafter passed to and became vested in the appellees in this cause, and upon their rights as therein and thereby acquired the appellees depended as against the title and interests asserted in the 76½ acres of land by appellants.

Arnold and wife were therefore the common source of title between the rival claimants, and that fact was shown and the cause was tried below upon that theory.

Appellants on May 8, 1919, in the form of trespass to try title, brought this suit against the appellees to recover "all of the oil, gas, coal, or other minerals in and under" the 76½ acres of land referred to, which they claimed to own in fee simple, together with certain surface rights, including the right of ingress and egress for mining purposes, subject, however, to certain specified reservations, among them one-tenth of all the oil produced and saved upon the premises.

The appellees, who were the defendants below, answered with pleas of not guilty, and specifically pleaded the further defenses relied upon, which included limitation, estoppel, and innocent purchaser. All of them except McGary further set up a cross-action by which they sought a rescission and cancellation of the instruments under which the appellants claimed title.

The cause was tried before a jury, and at the close of all the evidence the court peremptorily directed a verdict in favor of the appellees, which was duly returned, and thereupon judgment that appellants take nothing by their suit, and that the appellees have in their favor a cancellation of the instruments of title declared upon by appellants followed. From that judgment this appeal proceeds.

It was evidently the view of the trial court that this grant from Arnold and wife to Underwood in legal effect was a mere option or right to prospect upon the land and did not invest Underwood or his assigns with the legal title to "the oil, gas, coal, or other minerals in and under the land," and that the long nonuser by them of the property, which is hereinafter more fully referred to,

operated as a forfeiture or abandonment of any right they might originally have had under that instrument, and such is the contention of the appellees upon this appeal.

The appellants, upon the other hand, insist that there passed to Underwood and his assignees by that instrument, and as a result of their substantial performance of all obligations and duties incumbent upon them thereunder, an interest in the land itself to the extent of "all the oil, gas, coal, or other minerals in or under the land," subject to a reservation of one-tenth of all oil produced and saved upon the premises, and that they showed a regular and sufficient chain of title to it as such, first in time and superior in right, under the common source.

Apart from this difference between the opposing litigants as to the intrinsic nature and consequent legal effect of the quoted contract, the further claims urged in their briefs by the appellees of a failure of right or interest in appellants are: (1) That a release executed January 5, 1909, by A. J. Eilers reinvested the Arnolds with all such title, if any, as at that time remained in the Equitable Mining Company; (2) that appellees and those under whom they claimed were innocent purchasers of the land for value without notice of the claims subsequently asserted by appellants; and (3) that under the facts developed appellants were estopped to claim the conveyance to Underwood to be still in effect.

Since the situation here presented, except in so far as it may be affected in whole or in part by the Eilers release, is regarded as one dependent upon the construction that should be given the Arnold-Underwood conveyance in the light of what the facts show was or was not done under and pursuant to it, we first proceed to a consideration of that release. As stated, it bore the date of January 5, 1909, was signed and acknowledged on the same date by A. J. Eilers as president of the Equitable Mining Company, using the corporate seal, and in its body carried the recitation:

"Now, therefore, know all men by these presents that the Equitable Mining Company, a private corporation, duly incorporated under the laws of the state of Texas, acting herein by its president, A. J. Eilers, who is duly authorized"

—but for some reason was not put of record until more than nine years later—that is, not until April 1, 1918. In terms it referred to the Arnold-Underwood grant, of February 23, 1901, denominating it an "oil lease," declared the same to be null and void, and, without reciting a consideration of any sort, purported to discharge and release the land it covered from its provisions.

[1, 2] In the first place it must be noted that the Equitable Mining Company, one of the predecessors of appellants in title, by the undisputed proof, at that time did not own but an undivided two-thirds interest in the property under Underwood, the other like interest of one-third being then outstanding in the Arnold Oil Company, another of appellants' predecessors. Obviously such release could not affect the latter interest. For reasons just as potent, we think it was equally futile against the two-thirds interest of the mining company. That company, which was a private corporation under the laws of Texas, had some years before, on July 1, 1905, forfeited its right to do business on account of failure to pay its franchise tax. This being its condition on January 5, 1909, by the express provisions of our statute (Sayles' Texas Civil Statutes, Supp. 1906, arts. 5243i, 5243j, as amended in 1905), the corporation was forbidden to transact any business, and if the making of the release was an act of business, which it plainly was, Eilers, as an agent or officer, could not lawfully do for it what his principal was without legal capacity to do for itself.

[3, 4] Furthermore, we think it clear, under the facts shown, that Eilers was wholly without the power to do what the purported release is claimed to have accomplished. As the president of a private corporation, years after it had forfeited its right to do business under the laws of both its origin and domicile, for no consideration of benefit to his principal, he assumed to give away in behalf of the corporation very valuable property rights without other justification than his own voluntary ipse dixit that its title had failed. On this trial stockholders of the mining company quite generally testified that they had never consented to the release, never knew of its existence until shortly before the filing of this suit, and that, so far as they had ever heard or known, there had never been any action of the company's board of directors with reference to the matter. There was no evidence that any other stockholder or director than Eilers himself ever participated in the execution of or had any knowledge concerning this paper until about the commencement of this litigation, and the circumstances which were shown to have attended its procurement repel any inference that there ever was any action touching it by the corporation's governing body. In this condition of affairs it is a matter of no legal consequence that the individual who issued it did so by attaching the corporation's seal and recited that the corporation was acting through him. The resulting situation is not a mere matter of evidence, or of the burden of proof, as to the existence or not of authority in the president of a corporation to formally execute under its seal a transfer in regular course of its business, which, under well-settled authority (Cook on Corporations [7th Ed.] vol. 3, p. 2550; Catlett v. Starr, 70 Tex. 485, 7 S. W. 844; Railroad v. Davis, 93 Tex.

378, 54 S. W. 384, 55 S. W. 562; Magee v. Paul, 159 S. W. 328), will prima facie be presumed, but, by uncontroverted proof, presents an instance of the assumption by such an officer of unusual, exceptional, and extraordinary power, clearly outside the ordinary course of affairs and beyond his apparent or ex officio authority. Under equally as firmly established principles, it devolved upon those claiming rights by virtue of the exercise of that power "to inquire as to its existence and as to the facts which bring it into being." Fitzhugh v. Land Co., 81 Tex. 306, 16 S. W. 1078; Land Co. v. McCormick, 85 Tex. 416, 23 S. W. 123, 34 Am. St. Rep. 815; Cook's Corporations, vol. 2 (6th Ed.) § 681, p. 2055; Mechem's Agency (2d Ed.) vol. 1, §§ 817, 818, and 827; Harbor Co. v. Manning, 94 Tex. 558, 63 S. W. 627.

The attempted release being then inoperative and invalid as to all the appellants, the conclusion logically follows that, in so far as grounded upon it, the pleas of innocent purchaser and estoppel were abortive. Mast v. Tibbles, 60 Tex. 307; Moss v. Berry, 53 Tex. 632; Lumber Co. v. Hancock, 70 Tex. 312, 7 S. W. 724; Watts v. McCloud, 205 S. W. 384.

The issue as to whether there was a proper basis in the other facts shown for these two last-mentioned defenses being, in our opinion, closely interwoven with the major question in the cause, that is, what effect should be given the original grant to Underwood, recurrence is now had to that matter.

[5] We think that instrument, attended and followed—as it undisputedly was shown to have been—by a substantial performance of its drilling terms, an accomplishment brought about with the knowledge and approval of its grantors, the Arnolds, and at an expenditure by the grantee's assigns of about $30,000, vested in Underwood and his assigns the legal title in fee to "all the oil, gas, and coal, and other minerals in and under" the 76½ acres of land in question, subject to a reservation of one-tenth of all oil produced and saved upon the premises for the period of 25 years, and as much longer as such minerals can be produced thereon in paying quantities.

Looked at from its four corners, that is apparently not alone the plain import of the simple and direct language used, but, if recourse be had to the circumstances surrounding the parties at the time of its making and their own immediately succeeding acts in interpretation of their intent and meaning in entering into the contract they did, that result seems to follow as a reasonable, if not necessary, inference.

With us in Texas all such theories as that oil and gas are of too errant a nature to become the subject of a title in fee, or that the time designated as "25 years and as much longer as oil and gas can be produced in pay-ing quantities" would not constitute such a title one capable of indefinite duration, or that, there being only a term of years expressed, a chattel interest only, and not a title in fee, would pass, have been authoritatively discarded (Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989, and citations there noted); so that, these parties having the undoubted right to so agree, what good reason can there be in this instance for saying that they did not intend to pass from one to the other an interest in the land itself when the words they chose were so apt for that purpose as to have become imbedded in the jurisprudence of all English-speaking peoples as the accepted medium for an actual conveyance of that character?

[6] Quite true it is that mere words of conveyance alone, though apt and usual, will not fix the character of the estate that passes, if from the context of the instrument as a whole the plain intention of the parties was otherwise; but, in the absence of any such contextual indications, these chosen words will neither be disregarded nor given other than their usual meaning in the trade, business, or transaction to which they relate.

In February, 1901, West Columbia was upon the map of Texas chiefly as the cradle of her early struggles, not as the repository of untold millions of wealth in subterranean petroleum. By common knowledge, if not judicial cognizance, oil had at that time been found in but one place in all the commonwealth, the Lucas gusher having just been brought in at Beaumont, more than 100 miles away. This little rural homestead of the Arnolds was of very small value for any known purpose, perhaps not so much as $10 per acre, and the procurement of a testing of it under such prevailing conditions for subsurface oil and gas may well have been the dominating thought with them in enlisting Underwood in the enterprise; in other words, it was then a strictly wildcat undertaking, and the real, the moving, incentive to the grantors must have been the money and effort contemplated to be spent by the lessee in the attempt to prove it to be oil-bearing land, the small royalty reserved being a secondary as well as a purely contingent one. For that reason they were willing to and did presently in terms give up and convey "all the oil, gas, coal, and other minerals in and under the land," reserving only one-tenth to themselves, but upon carefully particularized express conditions subsequent which would fully protect them by declaring a termination of the interest so granted him, in event their grantee did not thereafter do what was of necessity contemplated, though not by binding obligation agreed upon—that is, comply with the drilling conditions specified.

Now, that Underwood and his assigns, as

already indicated, did to all substantial intents and purposes meet and comply with these conditions stands in this record uncontroverted. Within a few months after receiving this conveyance from Arnold and wife, by assignment of his interest thereunder, he enlisted in the development of the property the Equitable Mining Company, the corporation hereinbefore referred to, and under it in turn others were interested in the undertaking, until by July, 1904, four wells had been drilled upon the property, about $30,000 in money had been spent in the work, and at least one well that produced oil in paying quantities had been completed and brought in on the 76½ acres. These actual operations for the drilling of a well for oil and gas were both commenced and prosecuted with due diligence, through the best drillers obtainable, within two years from February 23, 1901, this first one above mentioned as having produced oil in paying quantities (the second in which oil was found on the premises) being begun by the Arnold Oil Company in October of 1902, shortly after October 9th, and sunk to a depth of 500 feet. From and after October 9, 1902, the Arnold Oil Company had joined forces with the Equitable, and together, practically continuously, during the years 1901, 1902, and 1903, they with due diligence prosecuted the work until in all there had been the four wells drilled, at the total outlay stated, their depths running from 500 to 1,212 feet, this last one being regarded among the best operators at that time as a completed test of that territory for oil, since the usual depth for a well to be sunk in search of oil was then 900 to 1,050 feet only.

There was also evidence to the effect that the Arnolds were on the ground a great deal while this work was going on, knew of these operations and their results, were well satisfied with them, acquiesced therein, and in fact received royalties on this production from Underwood. In July, 1904, however, Underwood's assigns stopped drilling on the land, and then came, beginning in November, 1906, the transfers covering the same property from Arnold and wife to other parties hereinabove mentioned, under whom the appellees here claim and hold.

Pursuant thereto and soon after the dates thereof, such grantees or their assigns took possession of the surface only of the different tracts so conveyed to them, which embraced the entire 76½ acres in question, and used it for farming and grazing purposes until March, 1918, regularly paying the taxes on it during that period, when the appellee Texas Company began drilling operations thereon for oil.

It was further shown that from the time Underwood's assigns ceased drilling on this land in 1904 down until December, 1918, there was practically continuous drilling on adjoining tracts, without any paying results.

On this last-mentioned date the Humble Oil Company brought in a paying well on a contiguous tract, and on January 3, 1919, the Texas Company, one of these subsequent grantees from the Arnolds, brought in a gusher on this Arnold tract. Then followed the filing of this suit on May 8, 1919.

[7] At this point it conclusively appears that no limitation operated to bar the rights of appellants, because there was for the length of time required no adverse possession, cultivation, use, or enjoyment of the subsurface land, since possession of the outer surface only is not that of the minerals beneath. Luse v. Parmer, 221 S. W. 1031; Northcut v. Church, 135 Tenn. 541, 188 S. W. 220, 223, Ann. Cas. 1918B, 545, and cited authorities; Manning v. Coal Co., 181 Mo. 359, 81 S. W. 140, 145; Thornton's Law of Oil and Gas (3d Ed.) vol. 1, §§ 334, 335.

Under the peculiar wording of this grant, in the light of these attending facts and circumstances, the view that an interest in the land as such passed to Underwood, at least on his compliance with the drilling conditions, rather than a mere leasehold right or option to prospect upon it, seems to us inevitable under the latest and most authoritative pronouncement of our Supreme Court in Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989, as well as in consequence of its refusal of a writ of error (107 Tex. at page 240, 176 S. W. 722, L. R. A. 1917F, 996) in Southern Oil Co. v. Colquitt, 28 Tex. Civ. App. 292, 69 S. W. 169. We are unable to distinguish those cases upon the controlling facts from the one here presented. Because of them, and of their being either a later holding or of superior authority, no attempt is here made to iron out any inconsistencies, if such there be, between their clear declaration on the question of legal title and the previous decision of the same court in the Teel Case, 95 Tex. 586, 68 S. W. 979, its refusal of a writ of error in the Witherspoon-Staley Case, 156 S. W. 557 (107 Tex. 241, 176 S. W. 722, L. R. A. 1917F, 989), or in the holdings of the Courts of Civil Appeals in the Fisher, Woodrum, and Bailey-Williams Cases, reported respectively in 178 S. W. 905, 188 S. W. 246, and 223 S. W. 312.

The appellees undertake to differentiate the Daugherty Case from the one at bar on the asserted ground that a "present consideration was paid sufficient to vest the title to the minerals in place without making it necessary to develop for royalty," but in our opinion the distinction is artificial rather than real, since a reference to the recitals in that case shows the independent consideration to have been only $100. The acreage conveyed is not given, nor are the values involved otherwise stated, so it does not appear that, relatively, the $100 there paid was any less nominal than the $1

likewise appearing here. Moreover, in the Colquitt Case the amount so acknowledged was also $1, and yet the Supreme Court, in relying upon and giving the sole reason for a refusal of a writ of error in it in the Daugherty Case, said:

"This court refused the writ of error. It could have done so only under the view that the interest created by the instrument was an interest in the realty itself, requiring for its validity the joinder of the wife because of the homestead character of the realty." 107 Tex. 240, 176 S. W. 722, L. R. A. 1917F, 989.

Furthermore, there was no circumstance tending to weaken the effect of the acknowledgment of the $1 here. Like any other receipt, it was presumably paid (Lanier v. Foust, 81 Tex. 187, 16 S. W. 994), and no reason is perceived why it did not serve the purpose of a valid independent consideration (Hitson v. Gilman, 220 S. W. 140, 143; McKay v. Tally, 220 S. W. 167, 169; McKay v. Lucas, and Same v. Kilcrease, 220 S. W. 172, and 177, respectively; Tucker v. Glew, 158 Iowa, 231, 139 N. W. 565).

The conclusion is therefore reiterated that in the Daugherty, Colquitt, and present cases not only was there a not materially different receipt of a money consideration in each acknowledged, but that the other considerations of contingent royalties and operative expenditures were the same, as were in substance also all other provisions of the contracts bearing on the interests severally created by them. It is deemed unnecessary to parallel or repeat here these substantially common recitations running through the three grants. The instruments speak for themselves, and, that fact appearing, it must follow that, if an interest in the fee vested under either of the former, it did under the latter also, since it is inconceivable that the courts will construe the same provisions in identical surroundings one way in one case and differently in another.

In one important feature, however, the grant before us differed from that found in the Daugherty, Colquitt, or any other decided case to which our attention has been directed, in that, after reciting that a forfeiture may be prevented by the payment of $10 per year "until such well is commenced or until shipments from such mine have begun," it contained this significant provision:

"And it is agreed that the completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term of this lease."

[8, 9] This, we think, like all the other drilling terms, was plainly a condition subsequent, and that, when they are all taken and considered together, the expression of them is thus made so explicit as to clearly preclude the arising of any other by impli-

cation, except, perhaps, an obligation to protect the land from drainage from its sides and to further reasonably develop it, after it has first been proven to be oil-bearing territory. Additional terms may be read into the written contracts of parties only when they are silent about, and not inconsistent with, what is sought to be so interpolated, and not where, as in this instance, the express stipulations negative and repel them. Thomason v. Upshur Co., 211 S. W. 328; Grimes v. Goodman Drilling Co., 216 S. W. 203; Thornton on Oil and Gas, § 81, p. 129, and (3d Ed.) vol. 1, § 98, p. 157; Carper v. Gas Co., 78 W. Va. 433, 89 S. E. 12, L. R. A. 1917A, 171.

[10] The undisputed evidence already cited showing the completion of a well within the meaning of this provision, the rentals for the full period of 25 years were thereby regarded as satisfied, and the grant kept in force for that time, subject only, it is thought, if indeed to that, to the suggested contingent duty of reasonable protective and continued development, should it be shown in the meantime to be oil land. It becomes unnecessary to determine whether this last-mentioned implication would arise here, however, and that question is not decided, because, under the fact findings above made, at the time such contingency actually arose as to this land—that is, the discovery of oil in December, 1918, by the Humble Oil Company upon a contiguous tract—one of the appellees was in possession of and drilling on this land to the exclusion of appellants, which situation was preventive of a compliance by the latter.

[11, 12] Assuming, though merely for the sake of argument, that obligation to continue drilling or to meet contiguous development could have arisen under Underwood's conveyance, under the express holding of the Supreme Court in Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464, at most it only amounted to a covenant, not a forfeiture ipso facto, on the part of the lessee, the violation of which would have merely given the lessors ground in a proper action for that purpose, after due notice, demand, etc., to either recover damages for the breach or obtain a decree of rescission and cancellation of the contract.

No such case as for a violated covenant was ever attempted by the appellees, nor, under the facts appearing, could it have been sustained if it had been.

[13] Neither was there a loss or forfeiture by appellants of their vested interest in this property through abandonment, because that result, in the absence of some act or deed legally sufficient to divest the title, is inapplicable to a legal title to land. Barringer and Adams on the Law of Mines and Mining, p. 36; Dikes v. Miller, 24 Tex. 417; 2 Washburn on Real Property, § 1888 (6th Ed.);

Tiedeman on Real Property (enlarged edition) § 739, p. 603; 1 Corpus Juris, pp. 9, 10; Barrett v. Coal Co., 70 Kan. 649, 79 Pac. 150; Mayor v. Riddle, 25 Pa. 259; Coal Co. v. Wiggin, 68 Fed. 446, 15 C. C. A. 510.

[14] But, if that view were erroneous, and the estate created by this instrument were held to be of such a nature as might be so forfeited, still the judgment here could not stand, because the court below was without power to say, in the face of the very strong testimony introduced to the contrary, that abandonment had occurred; the question being plainly one for the jury.

After what has been said it seems hardly necessary to again recur to the claims of appellees that they were innocent purchasers, and that appellants were estopped to set up their rights under Underwood. Neither defense was made out. The plea of innocent purchaser was necessarily based alone upon the Eilers release, which we have held invalid, and therefore an insufficient support.

[15] As to the other one, our conclusions of both fact and law upon it may not be better stated than in this excerpt from the very able brief filed in this cause on behalf of appellants:

"The plea of estoppel cannot avail; for that, mindful that the plea cannot be based for land upon mere silence or inaction, or nonclaim or failure to pay taxes, or neglect, or want of use or possession, but only upon affirmative words or acts amounting to actual or constructive fraud, it is plain there was no estoppel in this case, as a matter of law upon the undisputed evidence: (1) Because it does not appear that anything was said or done by appellants, or any predecessor in title under the conveyance to Underwood, amounting to a disclaimer or denial of the title they now set up, misleading or otherwise; (2) because it does not appear that anything, if so said or done, was intended or would reasonably have been expected to be acted upon by the appellants, or any predecessor in title to them, in buying or developing the land in controversy; (3) because the appellees, and those with whom they are in privity, appear to have known from the records, and indeed did actually know, the facts of the appellants' title as well as the appellants or their predecessors in title, and to have made of them no inquiry whatever in that regard; (4) because it does not appear that the appellees, or any one with whom they are in privity, bought or developed the land in reliance on anything said or done by appellants or any predecessor in title, or upon which they had the right to rely, but on their own independent judgment, indulging simply in a mistaken legal deduction; and (5) in the development more than enough money has been admittedly received than is necessary to fully reimburse all outlay, and which will be allowed in the accounting; hence the essential to estoppel of pecuniary prejudice is wanting."

The facts thus catalogued are fully sustained by the record. The legal conclusions, we think, find support in the following authorities: Williams v. Conger, 49 Tex. 582; Murphy v. Welder, 58 Tex. 236; Mast v. Tibbles, 60 Tex. 301; Moss v. Berry, 53 Tex. 632; Page v. Arnim, 29 Tex. 54, 71–73; Smith v. Roberts, 218 S. W. 29, citing Burleson v. Burleson, 28 Tex. 383; Pierce v. Texas Rice Dev. Co., 52 Tex. Civ. App. 205, 114 S. W. 860, 861; Hume v. Carpenter, 188 S. W. 707; Scoby v. Sweatt, 28 Tex. 730, 731; Supply Co. v. Mining Co., 203 S. W. 70; Marble Co. v. Hollinger (Com. App.) 212 S. W. 153.

From the conclusions stated it follows that appellants were entitled to a judgment for the interest in the land as sued for by them, and it being made to appear here that the issues of accounting and damages were, by agreement in the court below between all the parties, postponed until the determination of the main issues herein disposed of, the judgment has been reversed, and the cause remanded to the trial court, with instructions to so enter judgment in favor of appellants and then to proceed to trial of the postponed issues, pursuant to the agreement between the litigants in the record.

Reversed and remanded, with instructions.

PLEASANTS, C. J., disqualified and not sitting.

SONFIELD, Sp. C. J. I concur in the holding of the majority in reference to the Eilers release and the pleas of innocent purchaser, estoppel, and limitation. I cannot, however, assent to the construction given the instrument executed by Arnold and wife to Underwood. But for the extreme importance of the question I would content myself with a mere statement of dissent.

The majority construe the instrument as a present conveyance of nine-tenths of the minerals in fee, subject to a condition subsequent, the drilling of a well within two years, or, in lieu thereof, the payment of rentals, or that, at any rate, upon a compliance by the grantee with the condition subsequent, the legal title to nine-tenths of the minerals in place vested in the grantee; the estate so vesting not being subject to divestiture through abandonment.

In the construction of the instrument, the intention of the parties must be sought from the language used. All parts of the instrument must be considered. If an ambiguity appears, or a doubt arises, resort will be had to the situation of the parties and the circumstances surrounding them at the time of the execution of the instrument. As stated by the court in Howeth v. Anderson, 25 Tex. 557–573 (78 Am. Dec. 538):

"To arrive at the intention, regard is to be had to the situation of the parties, the subject-matter of the agreement, the object which the parties had in view at the time, and intended to accomplish. A construction should be avoided if it can be done consistently with the tenor of the agreement which would be unreasonable

or unequal, and that construction which is most obviously just is to be favored, as most in accordance with the presumed intention of the parties."

In determining the scope and legal effect of an instrument of this character, it is, if not immaterial, at least far from conclusive, by what name it is called, whether a "lease," "contract," "grant," or "deed of conveyance," and the court will look to the language used in the instrument, aside from the terms so used, to determine its legal effect. 1 Thornton, Oil and Gas (3d Ed.) § 50.

It must be conceded that apt words of conveyance are used in the instrument. They are the same, however, as used in the instrument before the Supreme Court in National Oil & Pipe Line Co. v. Teel, 95 Tex. 586, 68 S. W. 979, and Corsicana Petroleum Co. v. Owens, 110 Tex. 568, 222 S. W. 154. So, likewise, the instruments in those cases are in all material respects quite similar to the one herein involved.

Of the instrument and its assignment, the court, in the Teel Case, says:

"Viewing the written agreements in the light most favorable to these parties, they do not pass an interest in the lands, but are mere contracts for an option by which they may acquire such interest."

In the Owens Case, in construing the instrument, the court says:

"The grantors, by the instrument, gave the grantee the right to prospect upon the land for a definite period; the right to seven-eighths of the oil," if oil is found; "the right, in lieu of its completing a well within the first year, to extend" the same for ten years "by making * * * quarterly payments; * * * the right * * * to surrender the lease."

In Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989, the court construed instruments quite similar to those in the above-cited cases and to the one before this court as conveying a present interest in lands upon condition subsequent and taxable as real property under our taxation statutes. In its review of the prior Texas cases it thus restates the holding in the Teel Case:

"In Oil & Pipe Line Co. v. Teel the contract was supported by only a nominal consideration other than the mere promise of the lessee to perform certain acts, but for the performance of which he was not bound. The contract was construed properly as the creation of a mere option which permitted the acquisition of an interest on performance of conditions—a mere optional right to acquire an interest in land, a character of instrument plainly distinguishable from those here presented."

I shall hereafter advert to that which, in the court's judgment, differentiated the instruments in the two cases. It is sufficient at this point to state that in none of the cases before our Supreme Court was the fact of the use of apt words of conveyance made the determinative test of the scope and legal effect of the instrument.

While apt words of conveyance are used, the parties in the instrument denominate the same a lease, the instrument containing the following provision:

"It is agreed that the completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term of this lease."

As apt words of conveyance are not conclusive, so neither is the meaning of the instrument by the parties. Denominating the instrument a lease, in a large measure, offsets the effect of the granting clause and remits us to the inquiry as to what the parties had in view at the time and intended to accomplish, unaffected by the fact of the use of apt words of conveyance or the naming of the instrument by the parties.

The subject-matter of the instrument is oil, gas, and such other minerals as might underlie the land, discoverable alone through prospecting. It recites the payment of $1. This is the only recited money consideration. Concede that $1 is technically a valuable consideration, yet it is but nominal. In argument it was conceded by all the parties that the $1 paid was the consideration for the right or option given the grantee to go upon the land for purposes of exploration and drilling, at any time within two years, or longer upon the payment of the stipulated rent money. The grantee was not, however, bound either to drill a well or pay the rental. What, then, was the consideration for a present grant in fee to nine-tenths of the minerals? It cannot be answered that it was the amount, large or small, to be thereafter expended in drilling or operating for the discovery of oil. Some instruments of this character so provide. Not so this instrument. In the absence of such recital and of any obligation upon the grantee to drill, there is no warrant for importing into the instrument such expenditures as a consideration.

In the majority opinion, after the statement that this instrument was executed but a short time after the discovery of oil at Beaumont, more than 100 miles distant from the Arnold land, it is said:

"This little rural homestead of the Arnolds was of very little value for any known purpose, perhaps not so much as $10 per acre, and the procurement of a testing of it under said prevailing conditions for subsurface oil and gas may well have been the dominating thought with them in enlisting Underwood in the enterprise; in other words, it was then a strictly wildcat undertaking, and the real, the moving incentive to the grantors must have been the money and effort contemplated to be spent by the lessee in the attempt to prove it to be oil-bearing land, the small royalty reserved being a secondary as well as a purely contingent one. For that reason they were willing

to and did presently in terms give up and convey 'all the oil, gas, coal, and other minerals in and under the land,' reserving only one-tenth to themselves, but upon carefully particularized express condition subsequent which would fully protect them by declaring a termination of the interest so granted him, in the event their grantee did not thereafter do what was of necessity contemplated, though not by binding obligation agreed upon—that is, comply with the drilling conditions specified."

In the view of the majority the Arnolds made a present grant of the fee to nine-tenths of the minerals under the land, being the only land, as far as is shown by the record, owned by them, in order that it might be determined whether or not the land contained minerals. They desired above all things to have their land tested, and in order to do this made such a grant to one not in any manner obligated to make any character of test. But, says the majority, the Arnolds were amply protected by a "carefully particularized express condition subsequent, which would fully protect them by a termination of the interest granted," if the grantee failed to do a thing promised, but which he was in no manner bound to do. The payment of $1 gave to the grantee the exclusive right upon the land for exploration purposes for a period of two years, and, notwithstanding the carefully particularized express condition, this period could be extended by the payment of $10 per year, as some authorities hold, for the full period of 25 years.

Had the grantee been obligated to drill and had the Arnolds owned other land in the immediate vicinity, there might be some ground for the assumption, and for reading into the contract a consideration not expressed. Upon such a state of fact the discovery of oil would enhance the value of the other lands of the Arnolds. But of what avail to the Arnolds that their land was valuable for oil unless the oil be produced therefrom and they receive their royalties? So far from royalties being a secondary consideration, to my mind it was absolutely the only consideration for the making of the contract by the Arnolds.

The view I entertain is thus stated by the Supreme Court in the case of Grubb v. McAfee, 109 Tex. 527, 212 S. W. 465:

"The consideration for this contract to the owner consisted alone in royalties on the minerals to be produced during the term of the contract, unless we can reasonably assume that it would benefit him to have his land proven as containing valuable oil deposits, though no oil was produced therefrom for a term like 20 years. No assumption of that sort can be reasonably indulged."

It is true, of course, that the Arnolds as owners of the land could dispose of it, or of any severable interest in it, in any manner and for any consideration satisfactory to themselves; yet quite a different construc-

tion should be given an instrument which, by the use of apt words of conveyance, grants the oil or other minerals in place for a present consideration, payable in cash, notes, or other property, independent of royalties, and one which, using the same words of conveyance, recites a purely nominal cash consideration, the real consideration being a royalty, possible alone through development, operation, and production. Eastern Kentucky Mineral & Timber Co. v. Swann-Day Lumber Co., 148 Ky. 82, 146 S. W. 438, 46 L. R. A. (N. S.) 672.

The consideration and manner of its payment accounts for the difference in construction of the instruments in the Daugherty and Teel Cases. In reference to the instruments being construed in the Daugherty Case, the court said:

"They deal with the oil, gas, and other minerals 'in and under' the land as property, in the ground, capable of ownership and subject to be conveyed, for, as such, in unmistakable terms they are 'granted, sold, and conveyed' to the grantee for a stated consideration acknowledged to have been paid, valuable in itself and independent of the royalties stipulated as payable to the grantor in the event of the discovery of such minerals, or any obligation imposed upon the grantee to explore for them."

In the majority opinion this distinction is declared to be artificial rather than real. Whether so or not, it is evident from the above-quoted language, and from the opinion in its entirety, that the court deemed it real and substantial.

The distinction is recognized in other cases and is shown to be quite a determinative factor. Eastern Kentucky Mining Co. v. Swann-Day Co., supra; Chandler v. Hart, 161 Cal. 405, 119 Pac. 516, Ann. Cas. 1913B, 1094. In Plummer v. Hillside Coal & Iron Co., 104 Fed. 208, 43 C. C. A. 490, and case between the same parties, 160 Pa. 483, 28 Atl. 853, the instrument conveyed the coal under the land for a present cash consideration, to be increased to a given amount if the quantity of coal reached the proportions described in it. The right of removal was given, the same to be exercised within 100 years, the grantee to pay a yearly rental of $1. No royalties were reserved and no obligation to operate imposed. The instrument, though in the form of a lease, contained words of present demise, and was held to be a grant of the minerals in place, for a present consideration. In Wilmore Coal Co. v. Brown (C. C.) 147 Fed. 931, affirmed in 153 Fed. 143, 82 C. C. A. 295, construing an instrument with apt words of conveyance upon a nominal consideration and with royalties reserved, the court distinguished between the Hillside Case and the case before it, saying:

"But the distinction between that case and this is manifest. There there was a sale and conveyance of the coal outright for the price of $200, which in that early day and place was

evidently accepted as its full value. * * * Beyond this there was no obligation on the part of the lessee, except the nominal rent of $1 a year, inserted probably to carry out the idea of a lease which was the form of conveyance adopted. The consideration to the lessor was not thus the development of the mineral value of the land as here. The lessee bought the coal as it stood in place at a definite price in cash; the only restriction being that he should get it out within the term of the lease, 100 years."

In argument herein much stress was laid upon the following clause in the instrument:

"This grant is not intended as a mere franchise, but is intended as a conveyance of the property above described for the purposes herein mentioned."

The word "franchise" in its technical sense is quite meaningless when used in this connection. A "franchise" is the grant of a right or privilege to an individual or corporation by the government, the sovereign, or by public authority. It involves the idea of a privilege, and as used in this clause it was doubtless intended as synonymous with "license." A "license" is a personal and revocable privilege to do some act, or a series of acts, upon the lands of another without possessing an estate therein. The instrument evidently intends to grant not a mere license, but an interest in the land. A lease for more than one year conveys an interest in the land, and is a conveyance of the property. Dority v. Dority, 96 Tex. 215, 71 S. W. 950, 60 L. R. A. 941. Hence an oil or gas lease upon property constituting a homestead, being the conveyance of an interest in land, requires the joinder of the wife. Southern Oil Co. v. Colquitt, 28 Tex. Civ. App. 292, 69 S. W. 169. This is the extent of the holding in the case, and is the effect given it by the Supreme Court in the Daugherty Case.

The instrument involved herein, as shown by the record, was one much in use in the state of Pennsylvania. In Barnsdall v. Bradford Gas Co., 225 Pa. 338, 74 Atl. 207, 26 L. R. A. (N. S.) 614, the Supreme Court of Pennsylvania said:

"Whether an agreement, commonly known as an oil and gas lease creates an estate or interest in land or is a mere license to enter and operate for those minerals has frequently been before this court, as the numerous reported decisions attest."

Construing an instrument which "granted, demised, leased, and let" for the sole and only purpose of mining and operating for oil, gas and other minerals, the court, after quoting from several cases, thus concludes:

"Many other cases to the same effect might be cited, but these are sufficient to show that the agreement between the plaintiff and his lessor was a lease, conveying an interest in the land, and was not a license to enter upon the land and operate for mining purposes."

It is evident that the intention of the parties was to declare the instrument, not a license, but a lease; the conveyance of an interest in the land. In the body of the instrument it is denominated a lease, and the record discloses that the parties so regarded it.

As before stated, the instrument was executed within a few weeks after the discovery of oil at Spindle Top. It was in the day dawn of the oil industry in Texas, and during the period of wildest excitement attendant upon the bringing in of the Lucas gusher. At that time little or nothing was known by lawyers or laymen of the oil industry, its usages, or the technical terms employed in instruments pertaining thereto. There was a wild scramble for leases in any section where there were indications of oil or rumors of its existence. The Arnolds owned a homestead of some 80 acres near West Columbia, upon which they had resided for many years. It was generally known that there were manifestations of escaping gas that had been noticeable from time to time on the Arnold place. It is in evidence that C. L. Nash, who had lived at Columbia, discussed the matter with Mr. Lucas, and it was decided to secure oil leases in Brazoria county. Nash, Bullock, and Underwood, the latter the grantee in this instrument, determined to act together in procuring oil leases in and about West Columbia. The industry being new in Texas the forms of oil leases in use by leading oil companies in those states wherein the oil industry had developed were used. The instrument in question was written on one of the forms procured from the Guffey Company; Guffey having been a Pennsylvania operator. The various leases procured by these three parties were subsequently transferred to the Equitable Mining Company, the transfer containing the following description:

"Said grantors have granted, sold, etc., to the Equitable Mining Company all the interest of every character vested in us, or either of us, as grantees or lessees in and to those certain lease contracts entered into by and between various parties as grantors or lessors and us, or either of us, as grantees or lessees, which lease contracts are commonly termed oil lease contracts, including 81½ acres out of J. H. Bell League to John C. Underwood by W. F. and Kate Arnold."

That the grantors as well as the grantee regarded the instrument as an oil and gas lease is evidenced by the fact that, upon the cessation of operations by the assignees of the Underwood interest, the Arnolds leased a part of the tract to another company and subsequently sold the entire tract, less some small tracts which they had theretofore conveyed to A. McGary. In addition to the general description of the land, the deed contained the following:

"Together with all the rights, both surface and any mineral rights to the same in any wise appertaining."

Considering the instrument in its entirety, in connection with the situation of the parties and the circumstances surrounding them at the date of its execution, and in view of the fact that both the grantors and the grantee regarded the same as what is commonly called an oil and gas lease, I am of opinion that it should be so construed and the rights of the parties determined as under such oil and gas leases.

But, in the view of the majority, this case is ruled entirely by the Daugherty Case. The question, and the only question, before the court in that case was whether the instrument involved conveyed a present interest in the lands subject to taxation as "real property" under article 7504, R. S. 1911.

The concluding paragraph of the opinion concisely states the holding of the court:

"It is our conclusion that these instruments had the effect to confer upon the plaintiff in error an interest in the several tracts of land described, the value of which was assessable against it for taxation."

Conceding that the instrument herein conveyed an interest or estate in the land, the inquiry remains: What character of estate so vested? If we go further and hold that, under the Daugherty Case, the grant was of a fee, subject to the condition subsequent that a well be drilled within the stipulated time, or in lieu thereof the money rental be paid, we have not yet answered the determinative question in this case whether the estate so vesting could be relinquished or divested through abandonment; in other words, if a fee, was it an absolute or a qualified and determinable fee?

If the instrument conveyed more than a leasehold, if it was the grant of a fee, it is clear that it passed with a conditional limitation, vesting for a specific purpose. The same clause which extends the grant beyond a mere license limits it to a specific purpose; the property being conveyed "for the purposes herein mentioned."

The purposes are clearly manifest from the terms of the instrument. They were the drilling, mining, and operating for oil and other minerals, there production and transportation. To this end and in order to accomplish these purposes, the right of ingress and egress over and upon the land, and other necessary rights in the surface, were granted.

If the estate conveyed was a leasehold, it could, of course, be abandoned. Grubb v. McAfee, supra.

If the estate was a freehold interest, as held in Watford Oil & Gas Co. v. Shipman, 233 Ill. 9, 84 N. E. 53, 122 Am. St. Rep. 144, cited and quoted from in the Daugherty Case, in the language of the Supreme Court of Illinois:

232 S.W.—36

"Such interest [a freehold], being vested for a specific purpose, becomes extinct when the purpose is accomplished or the work is abandoned."

If, as held in Paine v. Griffiths, 86 Fed. 454, 30 C. C. A. 182, and the Wilmore Coal Co. Cases, supra, the interest transferred was a grant of the minerals, not absolute, but qualified, an abandonment divested the estate and remitted the grantors to their former condition. In a word, the rights and obligations of the parties under this instrument are the same as those of a lessor and lessee, whether the estate conveyed be termed a leasehold, a freehold, or a qualified and determinable fee.

To construe the instrument as an absolute and unqualified fee, upon condition subsequent, finds no warrant in the Daugherty Case, nor in any of the reported cases in this state, or in any well-considered case in other jurisdictions to which we have been cited. An instrument of this character, dealing with oil and other minerals, expressly stipulating that the interest or estate, whatever its character, vests for a specific purpose and the fulfillment of that purpose, in this case the discovery and production of oil being the only consideration upon which the grant rests, cannot reasonably or justly be construed as vesting an absolute and unqualified fee. To so construe it would be to allow the grantee "to retain the minerals, while disregarding and abandoning the obligations on which the right to them depends." Paine v. Griffiths, supra.

Appellants assert that, if the instrument be held a lease and not a present grant of the fee to the minerals, then, eliminating what counsel terms the "intermediate language of the condition," reading, "It is agreed that the completion of a well shall operate as a full liquidation of all rentals under this provision during the remainder of the term of this lease," all the conditions of the contract were complied with in the completion of the well, and thereupon the lessee became vested with an absolute title to the minerals without further obligation; that, if this is not true with the intermediate language eliminated, it is certainly true in virtue of this language, which is preclusive of any implication for additional development or operation.

Considering the lease with the intermediate language omitted, the only express condition is as follows:

"In case oil operations for either the drilling of a well for oil, gas, or other minerals is not commenced and prosecuted with due diligence within two years from this date, then this grant shall immediately become null and void as to both parties; provided that said second party may prevent such forfeiture from year to year by paying to the first party the sum of $10.00 per year until such well is commenced, or until shipments from such mine have begun."

The instrument thus calls for the drilling of but one well, and makes no express provision for operation or further development, so that, eliminating the intermediate language and regarding the instrument as a lease, it is in effect the same as the one considered by the court in Grubb v. McAfee, supra. There being no express provision for operation or further development upon the completion of the one well, wherein oil was found in paying quantities, the obligation to operate with reasonable diligence and to reasonably develop the land would be implied in order to effectuate the evident intent of the parties—that is, the production of oil. The lease thus standing, the lessee's rights under the contract, though not subject to forfeiture for breach of the implied obligation, could be lost by abandonment. Grubb v. McAfee, supra.

It becomes necessary then to determine what, if any, effect, the intermediate language has upon the rights of the lessee.

It is the contention of appellants that the intermediate language provides in terms express, unambiguous, and certain that rentals may be paid for the full definite term of 25 years, and that a completed well shall be the equivalent of the payment of the rentals for such entire term; that is, the completion of the well had the same effect as though, in lieu of the drilling a well, rents were being regularly paid at the stated intervals, thereby keeping the lease in full force and effect without other or further obligations.

The authorities are not harmonious as to whether a lessee, agreeing to drill within a given time, under penalty of forfeiture, but allowed to save a forfeiture by payment of a money rental, may refrain from all operations and keep alive the lease for the full term by the payment of the rentals, nor is this question involved herein.

It cannot be doubted, in view of the insignificant rental, that the provision is for the benefit of the lessee. The authorities are in agreement that the payment of the rental constitutes a consideration for the delay, and during the period after the acceptance of the rental the lessor may not declare a forfeiture of the lease for the nondrilling of a well. It is in the nature of a consideration from the lessee for the right or option to delay performance of the contract during the particular period over which the payment, by the terms of the lease, extended. Hitson v. Gilman, 220 S. W. 140, and authorities therein cited.

I concur in the view of appellants that rentals cease upon the completion of a well, whether it be producer or nonproducer. The lessee was to drill a well or pay rental. The well was completed, and thereby the lessee released from further payment. This is the clear and unambiguous meaning of the clause, and is its full effect. Parish

Fork Oil Co. v. Bridgewater Gas Co., 51 W. Va. 583, 42 S. E. 655, 59 L. R. A. 571.

But this was not the only effect of the completion of a well. Such completion satisfied the condition subsequent. Thereupon, without the discovery of oil and without reference to the intermediate language, an estate or right vested in the lessee; a right to continued possession for the purpose of further exploration for as long a time, within the term of the lease, as the lessee in good faith was engaged in drilling or in any manner testing the oil-producing capacity of the land.

The lessee was not obligated to drill any well, or to pay any rentals. Having entered upon the work and completed a well, he acquired a vested right to a continuation of possession for the purpose for which possession was originally taken. As there was no obligation to explore or drill in the first instance, so there was no express obligation to further explore or drill upon the completion of the well. If, however, he retains possession, the law implies the obligation to further explore and drill; the intermediate language not being in any wise inconsistent with or negativing such implication. When satisfied that oil could not be obtained in paying quantities, or when, for any other reason, exploration, drilling, and operations are abandoned, all rights are relinquished and estate divested. Grubb v. McAfee, supra. Eaton v. Allegany Gas Co., 122 N. Y. 416, 25 N. E. 981.

Appellants assert that the assignee of the lessee under whom they claim did more than complete a well; it discovered oil which, for a time, was produced in paying quantities, and under the express terms of the instrument this vested in such assignee an absolute title in fee to nine-tenths of the minerals, a legal title unconditional, and which cannot be lost or relinquished through abandonment. The provision in the instrument referred to is as follows:

"In case the party of the second part should bore and discover either oil or other minerals, then in that event this grant, incumbrance, or conveyance shall be in full force and effect for twenty-five years from the time of the discovery of said product and as much longer as oil, water, gas, or other minerals can be produced in paying quantities."

This clause must not be segregated from its context. It must be read in connection with other parts of the instrument, having in view the intention of the parties. The "grant, incumbrance, or conveyance" is a lease. This clause but fixes its duration with a contingent right to an extension. Upon the discovery of oil an estate vests in the lessee, but a qualified and limited estate, the right to make further exploration and to develop, produce, and remove the minerals, the theretofore existing right of possession, merely for

the purpose of exploration, being converted into such estate for the fixed term, and, if minerals be actually produced in paying quantities within the term, as long thereafter as they continue to be so produced. Cassell v. Crothers, 193 Pa. 359, 44 Atl. 446; Murdock-West Co. v. Logan, 69 Ohio St. 514, 69 N. E. 984; Lowther Oil Co. v. Miller-Sibley Co., 53 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027; Venture Oil Co. v. Fretts, 152 Pa. 451, 25 Atl. 732; Smith v. Root, 66 W. Va. 633, 66 S. E. 1005, 30 L. R. A. (N. S.) 176; Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107; Toothman v. Courtney, 62 W. Va. 167, 58 S. E. 916; Parish Fork Oil Co. v. Bridgewater Gas Co., supra.

In the last-cited case the court said:

"What the lessee acquires by discovery is the right to produce and take the oil, paying out of it the stipulated royalty, and not title to the oil as it remains in the land without production."

Such right or estate may be lost through abandonment.

I have found no well-considered case going the length of holding that a lessee under an oil and gas lease, upon the mere discovery of oil, is absolved from all further obligations and becomes vested with an absolute and unconditional title to the minerals in place, which cannot be lost or relinquished through abandonment. Parties can doubtless so contract, but these parties did not. In the light of the manifest intention of the parties in the execution of the instrument, and having regard to the real consideration therefor, nothing short of a clearly expressed provision to that effect will warrant a court in so holding.

The majority hold that, if there existed an implied obligation upon the lessee to further develop, this, under Grubb v. McAfee, amounted only to a covenant, the violation of which gave no ground for forfeiture, but in a proper action, after due notice and demand, the right to the recovery of damages or a decree of rescission and cancellation. This confounds abandonment and forfeiture. Abandonment is a voluntary relinquishment, while forfeiture is an enforced release. 1 Thornton, Oil and Gas, § 155. In the Grubb Case it was held that, while a forfeiture could not be declared, nevertheless the rights of the lessee were lost through abandonment. This action is in trespass to try title. Appellants, as plaintiffs, must establish their title. Appellees but availed themselves of the defense of the divestiture of appellants' title through abandonment.

Abandonment is the relinquishment of a right—the giving up of something to which one is entitled. Dikes v. Miller, 24 Tex. 417. Ordinarily it rests upon intention and is a question of fact for the jury. 1 Thornton,

Oil and Gas, § 155. However, as said by the court in Atchison v. McCulloch, 5 Watts (Pa.) 13:

"Abandonment is not always a question of intention, exclusively for the jury, without a controlling instruction from the court. Under a certain uncontradicted state of facts, the law will pronounce the conduct of a party to be an abandonment, whatever may have been his intention."

In consultation I was inclined to the view that the question of abandonment should have been submitted to the jury. Upon mature reflection, however, I have reached the conclusion that the record presents an uncontradicted state of facts, warranting a holding of abandonment as a matter of law. Paine v. Griffiths, supra; Chandler v. Hart, supra; Wilmore Coal Co. v. Brown, supra.

I do not deem it necessary in this opinion, a mere dissent, to detail the facts disclosed by the record upon which I base my conclusion.

I am of opinion that the judgment of the district court should be affirmed.