### LASSIG et al. v. CAHILL.
### No. 7559.

Court of Civil Appeals of Texas. Austin.
June 26, 1931.

Rehearing Overruled July 22, 1931.

**McCLENDON, C. J.**

Cahill sued Lassig (and a corporation, his assignee) to cancel a 50-year lease, under which Lassig was given the exclusive privilege of quarrying stone on land near Round Rock. In the alternative Cahill sought damages for failure to reasonably develop and for breach of certain covenants in the lease. Trial was to the court without a jury, and judgment was in favor of Cahill, canceling the lease. From this judgment Lassig and his codefendant have appealed.

The lease was executed April 27, 1923. It provided for a royalty of $2 per railroad car of stone mined and shipped from the premises, and that, if less than 100 cars were shipped in any year, lessee should pay $300. The lease was to be forfeited upon failure to ship the minimum of 100 cars or to pay the $300. The original petition, filed December 27, 1929, alleged three grounds of forfeiture, in substance as follows: (1) Failure to ship 100 cars prior to April 27, 1924, whereupon Lassig "became indebted" to Cahill for $300, and upon failure to pay which the lease was forfeited; verbal extension of the lease for one year upon payment by Lassig of $250 and his promise to begin operations on a large scale; subsequent annual extensions from year to year upon like promises up to April 27, 1929, when Lassig represented he had large financial backing and would put the quarries in operation on a large scale if granted a little more time; and failure of Lassig to perform any of these promises, whereby the lease became forfeited. (2) Failure to perform an obligation in the lease to erect and maintain a gate where spur track entered the premises, whereby Cahill was inconvenienced and damaged in loss of and injury to stock. (3) Failure to operate and develop the quarries since the latter part of 1923, whereby both the written lease and verbal extensions were forfeited. Substantially the same grounds are alleged in the amended petition upon which the case was tried, with an additional alternative prayer for damages.

In addition to the holding that the lease had been forfeited by abandonment, which we will later consider, the trial court found that the cash consideration of $50 recited in the lease had never been paid "and has therefore failed"; and that the provision for erecting and maintaining gates had not been complied with. These findings and plaintiff's first ground of forfeiture will be first disposed of.

The failure of consideration finding which was not alleged in plaintiff's pleadings arose out of the following circumstances: April 25, 1922, a lease in terms substantially the same as that of 1923 was executed. It recited a cash consideration of $50, which admittedly

Ross, Wood, Lawler & Wood and Dyess, Jaworski & Strong, all of Houston, for appellants.

C. V. Lansberry, of Round Rock, and H. N. Graves, of Georgetown, and Thos. H. Stone, of Houston, for appellee.

was paid. It covered only 87 acres, but contained the stipulation that Cahill owned 1,000 adjoining acres covered by a previous lease, which had been abandoned, and Cahill agreed "to include said property within the terms of this lease agreement or supplemental agreement, upon the same terms and conditions as herein provided as soon as he can get fully released from said prior lease agreement." The 1923 lease carried the $50 cash consideration recital, and differed from the 1922 lease only in that it included the additional acreage. Lassig paid the $300 (due April 27, 1924, for failure to ship 100 cars) by check dated April 24, 1924, bearing the notation, "for one year rental on lease"; which check Cahill indorsed and cashed. The $50 recited in the 1923 lease was never paid. Lassig's version of the matter was that the 1923 lease was merely substituted for that of 1922, and the recitation referred to the $50 paid on the latter. No demand was ever made for a $50 payment on the 1923 lease, and no complaint was ever made that it had not been paid. Cahill merely testified that he never got the $50, which fact Lassig frankly admitted, except as stated, under the 1922 lease. At the end of each year under the 1923 lease, including 1929, Lassig paid, and Cahill accepted, the $300 for failure to ship the 100 cars. Checks covering these payments for the years ending 1925, 1926, 1927, and 1928, were introduced, each showing the indorsement of Cahill. In acknowledging the 1926 check, Cahill wrote (4—19—26): "Your check and letter came to hand O. K. to pay the lease. Many thanks, I was needing the check." Accompanying the 1928 payment, which was in the form of a cashier's check in favor of Cahill with the notation "for one years Rental for lease," and was indorsed and cashed by Cahill, Lassig wrote, "Enclosed please find cashier's check for $300.00 for one year's rental for lease." Cahill admitted getting the 1929 payment for which he executed the following receipt:

"Received of Oswald J. Lassig and Lassig Limestone Quarry Corporation, Houston, Texas, this the 22 day of April, 1929, the sum of Three Hundred and No/100 ($300.00) Dollars to cover lease rental on leases originally executed as between J. D. Cahill and Oswald J. Lassig, both of which are recorded in the Deed Records of Travis County, Texas.

"[Signed] J. D. Cahill."

■ From the foregoing it is manifest that, if Lassig's version of the recital of cash consideration was not correct, Cahill nevertheless acquiesced therein, and, in any event, waived the failure to pay same as a ground of forfeiture or failure of consideration.

■ The agreement in the lease regarding the erection and maintenance of gates was clearly not a limitation or condition subsequent, breach of which would terminate or afford ground to forfeit the lease; but was only a covenant for breach of which damages constituted the legal remedy.

There is no basis in the evidence for Lassig's first alleged ground of forfeiture. There was no failure to pay the $300 in 1924, and consequent abandonment and verbal one-year extension of the lease. That Cahill got this $300 is established by undisputed proof, including Cahill's own admission. Lassig gave Cahill a check for this amount on a Houston bank, dated April 24, 1924. Cahill indorsed the check and deposited it with a bank in Round Rock, which latter indorsed it April 26, 1924; and it was paid in Houston April 28, 1924. There was never any claim by Cahill that the lease had been forfeited for default in this payment; and, as above shown, at the end of each succeeding year the $300 was accepted in recognition of and in accordance with the terms of the written lease. Cahill's own testimony negatives the theory of default and verbal renewal as shown in the following excerpts:

"There was no agreement that way, that in April, 1924, Mr. Lassig wanted a one year oral extension and I agreed to that for $250, and he paid me the $250. * * * he never paid me $250. I had no agreement of that kind with Mr. Lassig."

"I did not have any agreement where I told Lassig that I would let him stay one more year by paying me $250.00; I did not have any agreement of that kind."

"I say here in my suit that I granted him an extension from time to time. I told him just to go ahead, I hope you will make money; and he went ahead under the same written lease that he started with in April, 1923."

This brings us to what we regard the controlling issue in the case, namely, whether the trial court's judgment can be sustained upon the theory of cessation or abandonment.

Appellee's theory in this regard may be summarized as follows: The leased premises contained valuable deposits of building stone, the development and marketing of which constituted the main consideration for the lease; the $300 in event of not shipping the minimum 100 cars each year was not a rental in lieu of development, but a penalty to force development; and therefore a total cessation or abandonment of operations on the lease worked a forfeiture, regardless of the $300 annual payments. This theory was upheld by the trial court.

We will consider this theory in the light of the provisions of the lease, the trial court's findings, and the evidence viewed most strongly in support of those findings.

The lease was for 50 years, granting "the exclusive right and privilege of mining and quarrying the rocks and stone only, and removing the same from the following described

property." In addition to the $50, the lease recited "the further consideration of the covenants. and agreements hereinafter mentioned."

We copy in full the pertinent portions of the lease:

(4) "Second party further agrees to pay to the first party the sum of Two (2.00) dollars per railroad car for every car of rock shipped or used by him off of said land, whether rough rock, cut rock, dressed rock or crushed rock. The payments·to be made hereunder on the 15th day of each month for all rock shipped for the previous calendar month, and second party agrees to begin operations and the quarrying of said rock on the land hereby leased within six (6) months from date hereof.

(5) "Second party shall have the privilege of removing twenty-five (25) cars of said rock from said land hereby leased without additional payment, said payment of $50.00 hereinbefore mentioned to be applied as a credit for said twenty-five (25) cars of rock."·

(8) "Second party agrees to pay Two (2.00) Dollars per car for all rock as stated in paragraph four (4) of this lease; and in addition thereto the party of the second part agrees that if there is any year that he does not quarry and ship as many as One Hundred (100) cars, then he agrees to pay to party of the first part the sum of Three Hundred ($300.00) Dollars·at McNeil, Travis County, Texas, for each and every year he fails to quarry and ship as many as one hundred (100) cars of rock; and if he ships more than one hundred (100) cars then he is to pay Two ($2.00) Dollars for every car shipped, and in ease the party of the second part fails to ship as many as one hundred (100) cars of rock or fails to pay the Three Hundred ($300.00) Dollars any year, then this lease is forfeited and the party of the first part may take possession without bringing suit in court."

(10) "Second party agrees to pay promptly and punctually all of the rents and for all rock hereinbefore provided for, and that he will quietly deliver up the said premises upon the expiration of the term of his occupancy. * * *"

The trial court's findings pertinent to the issue considered. read:

"Third : That the defendants have quarried approximately 20 car loads of rock since April 27th, A. D. 1923, up to the trial of this cause, and the rock quarried was in the latter part of the year A. D. 1923, and have not operated the quarries on the leased premises with' any degree of diligence whatsoever; that at the end of each quarry year, that is on or about the 27th day of April of each year, the plaintiff did complain to the defendants relative to his failure to operate the quarry on these premises in a diligent manner, and each time the defendants would promise more diligence in their operations.

"Fourth: That the defendants, Oswald J. Lassig, and the Lassig Limestone Quarry Corporation, have not proceeded with the development of these premises, and are not able to do so. That neither one of the defendants are possessed of sufficient capital to properly develop these rock and stone deposits.

"Fifth: That the machinery placed by the defendants on the lands of the plaintiff for the operations of said quarry; is antiquated, obsolete and not sufficient for the purpose of operating said quarry and developing the rock and stone industry upon these premises.

"Sixth : That the defendants, and both of them, have abandoned the leased premises for more than two years at a time, without any effort to operate or develop the same.

"Seventh: That the plaintiff, at a great cost to himself, in the beginning of this lease, purchased land for the purpose of enabling the defendants to connect their quarry with railroad transportation, but the defendants only paid the railroad company to build a short spur track which would only accommodate a few railroad cars and lacked several hundred feet of extending to this quarry, which necessitated the trucking of stone from the quarry to the railroad spur track and not permit the loading of the cars by crane or shovel from the quarry as contemplated by plaintiff when he purchased the large tract of additional land for the defendants' use for this purpose; and the I. & G. N. Railroad built a spur track as above mentioned for the use of the defendants for the loading of rock, which spur track has long since been removed by the Railroad, on account of the use of same having been abandoned by the defendants."

"Ninth: I further find that if the defendants had operated this quarry or a quarry on the leased premises with reasonable diligence, and even with the antiquated machinery they had upon the ground, that they could have gotten out at least three cars of stone each week, and with proper machinery and with ordinary diligence in the operations of these quarries could have gotten out easily a hundred car loads of stone a week.

"Tenth: I further find that neither of the defendants are possessed of sufficient funds, or credit, to operate this rock quarry with reasonable diligence.

"Eleventh : I further find that the stone and rock under the leased premises herein inquired about is very valuable, and is found in large quantities thereon, and if operated and developed with' reasonable diligence the revenues therefrom would be in a substantial amount to this plaintiff under this contract.

"Twelfth: I further find that the sum of $300.00 agreed to be paid by the defendants per year, would be approximately twenty-five cents per acre for such leased premises, and would hardly pay the taxes thereon; and that the stone on each acre of said premises is

worth in the market many thousands of dollars.

"Thirteenth: I further find that upon the execution of this lease agreement that the understanding of both parties was that large quantities of stone was to be quarried and marketed from these premises for the mutual benefit of both parties, and not that the premises be kept by lessee for speculative purposes and allowed to remain undeveloped.

"Fourteenth: That the leased premises have already been held an unreasonable length of time without any serious effort on the part of the defendants to develop and operate quarries thereon."

From these findings the court made the following conclusions of law:

"3. That the $300.00 agreed to be paid by the defendants each year to the plaintiff was a penalty for failure to ship as many as one hundred railroad carloads of stone during the preceding year, and was not a rental.

"4. That the defendants failed the first year to develop the quarries, and that since then have failed to operate and develop the quarry or quarries, and have therefore lost their estate for failure to operate quarries and develop the premises, and have therefore forfeited their rights under said lease.

"5. That defendants estate was only a determinable fee, and as a matter of law was lost through the cessation of operations and failure to develop.

"6. That defendants have abandoned the premises for the purpose for which the lease was entered into.

"7. That the defendants are not able to develop the premises, and have long since spent all their capital, and are therefore unable to answer in damages to plaintiff for failure to use the premises for the purpose of which the lease was entered into, and therefore their lease is subject to cancellation.

"8. It is the settled law in this State that where a mineral lease conveys no absolute title, but only a determinable fee, there can be no complete cessation of the use of the leased land for purposes of mineral exploration, development and production, save at the cost of the loss of the lessees estate."

■ The trial court correctly construed the lease as a terminable estate (not a fee, however, but an estate for 50 years). But we are not in accord with the trial court's views to the effect that the cessation of production since 1923 worked an abandonment and consequent forfeiture of the lease, notwithstanding the payment and acceptance each year of the $300; and this regardless of whether these payments be classified as penalty or rental.

There is much contrariety of view in the decisions of other states both as to the character of interest or estate created by mineral leases and as to the effect of breach of obligations, express or implied, on the part of the lessee, where forfeiture is not expressly provided for. In our state these questions have been clarified by our Supreme Court in a number of decisions. In Stephens County v. Oil Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566, and other cases decided at the same time, mineral leases providing for duration as long as there is production in paying quantities were held to create estates in the minerals in fee upon limitation. In Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.(2d) 27, 30, it was held that breach of implied obligation to reasonably develop did not work a forfeiture of the lease either ipso facto as upon limitation or at the election of the lessor, as upon condition subsequent; but gave to the lessor a right of action for damages or in a proper case for specific performance and cancellation in case the decree were not complied with. It was also recognized that the interest of the lessee might be lost by total cessation of production or abandonment. This latter holding was predicated upon the proposition that there had been a total cessation or abandonment of the purposes and objects of the grant which terminated the lease ipso facto as upon limitation. The Supreme Court decisions upon the subject were carefully reviewed.

■ If we should apply this holding to the case at bar as made by the trial court's findings, then there was an absolute termination of the lease several years prior to the payment in April, 1929. Such construction of the lease would be counter to that given it by both lessor and lessee from its inception up to the payment in 1929. The continued recognition of the existence of the lease and the acceptance of payments thereunder by the lessor were inconsistent with its prior termination; and clearly should bar the lessor from asserting a prior termination of the estate upon principles of waiver and estoppel. See Summers on Oil and Gas, p. 531 et seq., § 167, and authorities there cited.

Cahill's suit, in so far as it sought cancellation of the lease, must therefore depend upon what transpired after the 1929 payment.

While the testimony of both Cahill and Lassig is in many respects obscure and confusing, thus rendering difficult the construction therefrom of a consistent connected story, we think the following may be fairly deduced from the evidence regarding what transpired at and subsequently to the 1929 payment. When the payment was made and the receipt taken, Cahill complained, as he had theretofore done, that the quarries were not being developed and bringing in sufficient revenue to him. Lassig promised, as he had previously done on several occasions, to begin development, representing that he was arranging for financial backing, and expected

to develop on a large scale. It appears from Lassig's testimony that in 1923 he had a large contract to supply stone for the erection of the Herman Hospital in Houston. It was in the execution of this contract that the quarrying was done in 1923. A great deal of the stone supplied was rejected as inferior, and finally some of the stone already used in the building was condemned by the architect, and the contractor canceled his contract with Lassig. Before doing any more quarrying in 1929, Lassig testified that he proceeded to core drill, so as to determine, in advance, the character of the stone. It is undisputed that beginning shortly after the 1929 payment, up to the filing of the suit, with the exception of some six weeks in the fall when his foreman had to go to a hospital for treatment, he had his son and foreman engaged in operations at the quarries, during which time some core drilling was done; and several pieces of machinery were added to the equipment. In so far as cessation is concerned, there had been no production since the latter part of 1923; consequently there could not have been a cessation of production since the 1929 payment.

We have grave doubts whether the evidence will support a finding of abandonment since the 1929 payment. The case was not tried on that theory in the court below, neither as to the pleadings of Cahill nor as to the findings and conclusions of the trial court. And, as that is the only theory upon which, in any event, the trial court's judgment could be upheld, it would be necessary to remand the case for further trial.

■ We have reached the conclusion, however, that, upon proper application of the principles anounced by our Supreme Court, the doctrine of termination of the estate by abandonment cannot be applied to the lease under consideration.

We are dealing here, not with a contract which grants a mere license, or a letting of the premises upon a rental basis, but with a vested estate in the rock and stone on the premises for a definite period of years.

The lease here differs materially from those involved in the cases in which the Supreme Court has held that the estate terminated upon permanent cessation or abandonment, in that in those cases the only benefit accruing to the lessor at the time of cessation or abandonment was in the form of royalties derived from production.

In Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304, 305, 255 S. W. 601, the lease provided that it should be void in case operations were not commenced and prosecuted with due diligence within two years from date; "provided that said second party may prevent such forfeiture from year to year by paying to the first party the sum of $10.00 per year, until such well is commenced or un-

til shipments from such mine have begun, and it is agreed that the completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term [25 years] of this lease."

Anent this provision the Supreme Court said:

"The Court of Civil Appeals [232 S. W. 549] concluded that the wells drilled by Underwood's assigns liquidated all rentals and kept the grant in effect for 25 years. We think that the $10 per year payment clause had no relation to anything save prevention of a forfeiture from failure to drill with diligence, within two years from the date of the grant. After a well was drilled, with the required diligence, the grantee and his assigns were invested with title, freed of the express condition subsequent, to the oil, gas, and other minerals, and incidental rights, for 25 years from the time of discovery of the oil, gas, or other minerals, and as much longer as same might be produced from the 76½ acres of land in paying quantities. But such title vested only for the purpose specified in the writing through which the title was derived. If it were true that the full purpose of the contract was to merely prove the 76½ acres to be oil-bearing, there would be reason for saying that completion of a successful test vested indefeasible rights in the grantee or his assigns for 25 years or longer, but to so prove the land was no more than the first step towards the accomplishment of the true and ultimate purpose of all parties, viz. the mutually profitable production of oil, gas, or other valuable mineral. Grubb v. McAfee, 109 Tex. 531, 212 S. W. 464. The title and rights conveyed to Underwood or his assigns were to be held and used for no other purpose than mineral exploration, development, and production. When that purpose was no longer prosecuted by Underwood and his assigns, their title and estate instantly terminated."

In Waggoner v. Sigler Oil Co., above, in referring to the purpose clause in the lease in Texas Company v. Davis, the Supreme Court said that it " * * * was referred to in a dictum * * * as creating a condition subsequent; that effect having been ascribed to it by distinguished counsel on both sides, and by the learned judges writing the majority and minority opinions in the Court of Civil Appeals (232 S. W. 549). This may have arisen from failure to recognize a distinction between the customary 'drill or pay' clause and the 'unless' clause. The clauses under consideration in the Davis Case and here come within the class of 'unless' clauses. The correct rule seems to be that, while the usual 'drill or pay' clause in an oil lease does introduce a condition subsequent, for the benefit of the lessor alone, yet, as said by Mr. Summers, 'where the "unless" drilling clause is used, a failure of the lessee to drill or pay a stipulated sum of money ipso facto terminates

the lease, without the necessity of re-entry, action or their equivalents by the lessor. For this reason the interest created in the lessee by such lease cannot be one terminable by breach of condition subsequent. Some courts have designated them options or optional leases, but the interests created by them are perhaps better classified as estates upon common law limitation, wherein the interests in the grantee or lessee continue until the happening of the event upon which they terminate.' Summers, Oil and Gas, pp. 483, 506 to 512."

The lease here provided for compensation during the entire life of the estate in the form of royalties from production, an annual minimum being provided, and, in the event the minimum were not produced in any one year, there was an express obligation on the part of the lessee to pay $300, the language being "then he agrees to pay to party of the first part" that sum. This is the construction placed upon that language by Cahill's pleadings (he alleges that Lassig "became indebted" to him in this sum, by reason of failure to ship the minimum); and by the parties in their dealings, correspondence, check notations, and receipts, including the April, 1927, payment.

This construction is also deduced from Cahill's testimony. He had made two prior leases covering the property, first to Ferguson who had opened a quarry (extent of operation not shown) and later to Landerdale who had done nothing under his lease. He had owned the land and lived in the vicinity many years, and was familiar with the quarrying business and with the character of his property. He wished it developed, and had the lease drawn with that end in view in the light of his knowledge and previous experience. He placed the minimum at 100 cars because he believed that, if that amount was shipped, the property would be developed; and he inserted the $300 alternative payment because he felt that this would insure production of the minimum. The further alternative, of course, would be forfeiture of the lease.

Conceding that the purpose of the lessor was the development of his property in order to obtain the revenues from production royalties, we do not think the vested estate terminated from failure to produce in the face of those express obligations, inserted for the manifest and admitted purpose of securing such production to the lessor.

█ The implied obligation to reasonably develop, however, remained, and the $300 payments we think do not satisfy that obligation; for the breach of which Cahill has his remedies, as pointed out in the Waggoner Case.

With some of the trial court's fact findings we are not in accord, but they are not pertinent to any issue in the case under our above interpretation of the rights of the parties,

and therefore discussion of them is pretermitted. The evidence is ample to support a finding of cessation of production and abandonment several years prior to 1929, if the estate should be held terminable on those grounds, irrespective of the discussed provisions of the lease and the acceptance of the $300 annual payments.

The trial court's judgment is reversed, and the cause remanded to that court for further trial.

Reversed and remanded.